**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| RANDY W. WILLIAMS, § | |
| CHAPTER 11 TRUSTEE, § | |
| § | |
| Plaintiff, § | |
| V. § | CIVIL ACTION NO. H-11-2545 |
| § | |
| HOUSTON PLANTS & GARDEN § | |
| WORLD, INC., *et al.*, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND OPINION
ON MOTION FOR RECONSIDERATION**

**I.     Introduction**

Between 2001 and 2004, Community Bank and Trust, SSB ("CB&T") loaned several million dollars to Wayne Massey and Travis Massey (collectively, the "Masseys") and to OTWM Partnership and Green Valley Growers ("GVG") (collectively, the "Massey entities"), under various loan agreements. In 2004, MetLife Agricultural Investment loaned GVG and OTWM approximately $5.55 million. GVG used some of the Metlife loan proceeds to pay down loans to the Masseys and Massey-owned entities. GVG was the guarantor but not the primary obligor on these loans.

The plaintiff in this adversarial proceeding, Randy Williams, is the Chapter 7 Trustee. Compass Bank is the defendant as successor in interest to CB&T. On March 13, 2004, CB&T merged with Texas State Bank, and on March 13, 2008, Texas State Bank merged into Compass Bank.

Williams sought summary judgment that he was entitled to recover approximately $3 million that GVG used from the MetLife loan, arguably to pay off certain debts for the Masseys and Massey entities. The argument was that GVG defrauded its creditors, specifically MetLife, by guaranteeing

the debts of the Masseys and Massey entities, taking out a loan with MetLife as a primary obligor, and using the loan proceeds to pay off the loans it had guaranteed but was not the primary obligor, without receiving reasonably equivalent value. These transactions occurred, Williams argues, while GVG was on the brink of insolvency. Compass Bank cross-moved for summary judgment that it had no obligation to pay Williams. This court granted Williams's motion for summary judgment and denied Compass Bank's motion. Compass Bank moved the court to reconsider that ruling, Williams objected, and Compass Bank replied.

On July 17, 2014, the court granted the motion in part, concluding that the summary-judgment record did not support the conclusion that Compass Bank intended to defraud GVG's creditors. The court vacated its previous summary-judgment ruling in Williams's favor. In the July 17 order, the court reserved decision on whether it should also reverse its denial of Compass Bank's cross-motion and grant summary judgment in favor of Compass Bank, effectively closing the case. After further review of the summary-judgment evidence, the parties' submissions, and the governing law, the court concludes that although this is a close case, the acknowledged presence of two badges of fraud and the advantage of a full record weigh in favor of denying the cross-motion for summary judgment and having a short bench trial on the fraudulent-intent issue. A final pretrial conference is set for July 25, 2014 at 9:00 a.m. and the bench trial is set for July 30, 2014 at 9:00 a.m.

The reasons for this ruling, and the court's concerns about the merits of Williams's case, are explained in more detail below.

## II.     Factual Background

Wayne Massey controlled Houston Plants & Garden World, Inc. ("HPGW"), which had been in business since the late 1980s operating retail plant and tree nurseries in Houston. (Docket Entry

No. 78, Summary Judgment Appendix, at 5). In January 2000, HPGW borrowed $450,000 from Woodforest National Bank, Loan No. 6926080. (Docket Entry No. 87, Ex. A).

On June 28, 2000, OTWM, a Massey entity, borrowed $900,640 from Woodforest National Bank, (the "Woodforest Note"), to finance the purchase of an 866-acre tract of land in Willis, Texas, (the "Willis property"). (Docket Entry No. 78 at 19–31). OTWM made a $233,264.74 cash down payment on the property. (*Id.* at 74). In return, Woodforest National Bank obtained a Vendor's Lien on the Willis property. (*Id.* at 24–31).

On July 21, 2000, Wayne Massey and his son, Travis Massey, established Green Valley Growers ("GVG"), a wholesale plant distributor and tree nursery servicing large retailers, such as Lowe's, Wal-Mart, and K-Mart. (*Id.* at 5, 16–18). GVG leased the Willis property from OTWM under a written lease and used the property to maintain most of its plants. (*Id.* at 5, 37–38). GVG would pay rent to OTWM, which would pass the money to the lender as payment. (*Id.* at 33–35). On occasion, GVG would not pass the money through OTWM and would instead pay OTWM's lender directly. (*Id*. at 34). HPGW was a GVG customer. HPGW's purchases accounted for approximately 10% of GVG's sales by 2004. (*Id.* at 7).

### A.   Refinancing

#### 1.   The Woodforest Renewal Note

On February 27, 2001, OTWM executed a $1,486,185.59 Renewal and Increase Promissory Note with Woodforest National Bank, (the "Renewal Note"). (*Id.* at 57–73). The Renewal Note included the remaining balance on the Woodforest Note plus an additional $600,000. OTWM also signed a Renewal and Increased Deed of Trust and Security Agreement to secure the Note. As further security, Wayne Massey, through GVG, executed a Security Agreement Pledge encumbering

GVG's plants, inventory, and equipment, and guaranteeing the debt. (*Id.* at 77–92).

On January 10, 2002, CB&T purchased the Renewal Note. Woodforest National Bank transferred the remaining principal balance of $1,473.868.88 and the lien on the Willis property to CB&T. (*Id.* at 57). OTWM executed a new Note with CB&T in that amount (the "OTWM Note"). (*Id.* at 175–77, Peyton Deposition). GVG and OTWM guaranteed the OTWM Note, which became Loan No. 8655540. (*Id.* at 93–94). On January 10, 2002, GVG passed a corporate resolution stating that it was "in the best interest and of direct benefit to [GVG] to execute a Guaranty of all indebtedness owed by OTWM Partnership to [CB&T] including . . . a promissory note in the principal amount of $1,473.868.88 . . . ; and that said Guaranty may reasonably be expected to benefit, directly or indirectly, [GVG]." (*Id.* at 95).

## 2. The Second Note and Refinancing

On March 5, 2001, the Masseys personally executed a promissory note payable to Woodforest National Bank for $700,000, (the "Second Woodforest Note," Loan No. 6929538). (*Id.* 114–21). GVG guaranteed this Second Woodforest Note and passed a corporate resolution stating that it would benefit GVG. (*Id.* at 122, 128–30).

On June 22, 2001, the Masseys executed a promissory note payable to CB&T in the amount of $5,500,000 (the "Massey Note"). (*Id.* 131–33). GVG guaranteed this note. (*Id.* at 134–36). The Massey Note was used as follows:

> 1. $703,111.11 was transferred to pay off the Second Woodforest Note. (*Id.* at 137);
>
> 2. $3,000,000 was transferred directly to GVG's bank account. (*Id.* at 144–45); and
>
> 3. Several transfers were made to cover HPGW loans with Woodforest National Bank and Enterprise Bank. (*Id.* at 137–42).

On August 13, 2002, the Massey Note was renewed and extended as Loan No. 8702383. (*Id.* at 148, 156–57).

### 3. The Third Note and Refinancing

On January 24, 2003, GVG executed a promissory note payable to CB&T in the amount of $2,100,000, (the "GVG Note"). (*Id.* at 100–12). The loan proceeds were used to refinance existing GVG debt. (*Id.* at 231 ¶ 10).

### 4. The MetLife Loan

On March 3, 2004, GVG and OTWM obtained a loan from MetLife Agricultural Investment to refinance and restructure its debts. (*Id*. at 41). As part of MetLife's underwriting process before making that loan, it had Trust Financial review GVG and OTWM. Trust Financial prepared a "$5 Million Secured Financing Memorandum" as part of MetLife's underwriting. (*Id.* at 5–15). The Financing Memorandum identified the purpose of the loan as refinancing "existing real estate and equipment notes [to CB&T] and to Enterprise Bank." (App. 5). The Memorandum described the security for the loan as the Willis property that "Wayne Massey carri[ed] . . . on the balance sheet for OTWM Partnership," and stated that the assets on GVG's balance sheet included the equipment and improvements on the Willis property. (*Id.* at 6). "An outside appraisal . . . from Dugger Canaday & Grafe, a San Antonio appraisal firm that has completed appraisals for MetLife in the past . . . estimated a value range of $8.4 mm to $9.5 mm for the Security." (*Id.*). The Financing Memorandum reviewed GVG, noting that "Mr. Massey has grown GVG from $3.4 million in annual sales in 2001 to $7.6 million sales in 2002. Sales for the 9-month period ending 9/30/2003 are at $7.7 million, already eclipsing the previous year's annual total"; that GVG "maintains a strong and diversified customer base. On the whole, [it has] accounts to over 120 different merchants"; and that

"the nursery and greenhouse industry is the fastest growing segment in US agriculture" because of, among other things, "the recent rise in residential and commercial construction due to lower interest rates [which drove] the demand for landscaping and indoor decoration." (*Id.* at 7, 12). The underwriting documents concluded with the following positive investment considerations:

- Strong Revenue and Net Income on combined basis
- Strong Equity position on a combined basis
- Low level of debt on a combined basis
- State-of-the-art production facility
- Over 23 years positive track record in the industry
- Strong, diversified customer base
- Increased sales to mass merchants, such as Lowe's Home Improvement

(*Id.* at 15). The negative investment considerations included the financial statements for GVG and HPGW, and the internally prepared financial statements for Wayne Massey, Travis Massey, and OTWM. (*Id.*).

MetLife made a $5.55 million loan to GVG and OTWM. The $5.55 million MetLife loan proceeds were used as follows:

> 1.   CB&T received $1,341.484.47 to pay off the remaining balance of the OTWM Note, Loan No. 8655540;
>
> 2.   CB&T received $1,266,525 to pay off the GVG Note, Loan No. 8735854; and
>
> 3.   CB&T received $2,000,000 to pay down the Massey Note, Loan No. 8702383.

Williams seeks to avoid these three transfers as fraudulent under TUFTA because GVG took out the loan to pay off the debts of others, knowing that it was on the brink of insolvency.

### B.     The MetLife Loan and GVG After 2004

GVG remained profitable from 2004–2007. In 2007, growth declined, but GVG was able to cover its debts. Capital One Bank, who also loaned GVG money, performed audits on GVG. Those audit reports show GVG's profitability and solvency near the time of the 2004 MetLife transaction. Things changed in 2008. The eye of Hurricane Ike passed directly over the Willis property, destroying GVG inventory and causing over a million dollars of uninsured damages. GVG's insurance carrier covered only part of the covered losses. The recession followed, causing home construction to slow, which cut demand for GVG's landscaping materials and products. The financial underwriting had relied in part on favorable projections for the housing market in concluding that GVG's business had strong growth potential. The analysis did not anticipate or take into account the effects of the hurricane and recession.

### C.     Procedural Background

GVG voluntarily filed for bankruptcy on March 9, 2009. The plaintiff, Randy Williams, was appointed the Chapter 11 Trustee for GVG's bankruptcy estate. When the case was converted to Chapter 7, Williams became the Chapter 7 Trustee. On March 8, 2011, Williams filed this suit and on September 7, 2012, he filed an amended complaint. (Docket Entry No. 17). On April 5, 2013, Williams moved for summary judgment against Compass Bank seeking to recover approximately $3 million. (Docket Entry No. 87). Williams argued that MetLife was defrauded when GVG took out the $5.55 million loan to cover the debts of OTWM and the Masseys. Compass Bank also moved for summary judgment, based in part on the argument that Williams could not establish fraudulent intent. The court granted Williams's motion in part and denied Compass Bank's motion in part. Compass Bank moved for reconsideration of the summary-judgment rulings. Under

separate order, this court reconsidered and vacated its summary-judgment ruling that Williams proved fraudulent intent as a matter of law. In this order, the court grants the motion to reconsider the denial of Compass Bank's summary judgment motion but declines to grant that motion on the present record. This ruling is without prejudice to finding and concluding based on the full record that the bench trial will provide that Compass Bank has proved the absence of fraudulent intent and therefore is not liable to pay Williams the transferred sums at issue.

### III.     The Legal Standards

#### A.     Motion for Reconsideration

"The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration." *See W&T Offshore, Inc. v. Apache Corp.*, No. H-11-2931, 2014 WL 1600540 at *3 (S.D. Tex. Apr. 21, 2014) (citing *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997) ("[T]he Federal Rules of Civil Procedure do not recognize a general motion for reconsideration.")). "A court retains the power to revise an interlocutory order before entering judgment adjudicating the parties' claims, rights, and liabilities." *Id.* (citing FED. R. CIV. P. 54(b)). "Reconsideration of an interlocutory decision is available 'as justice requires.'" *King v. Bigler LP*, 4:10-cv-580, 2011 WL 6960746, at *2 (S.D. Tex. June 24, 2011) (citation omitted). "[W]hether to grant such a motion rests within the discretion of the court." *Dos Santos v. Bell Helicopter Textron, Inc.*, 651 F. Supp. 2d 550, 553 (N.D. Tex. 2009) (citation omitted).

#### B.     Claims Under TUFTA § 24.005(a)(1)

"The Texas Uniform Fraudulent Transfer Act ("TUFTA") aims to prevent debtors from fraudulently placing assets beyond the reach of creditors." *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, No. 13-10171, 2014 WL 2598728, at * 3 (5th Cir. June 10, 2014)

(publication pending) (citation omitted); *see also Hahn v. Love*, 321 S.W.3d 517, 524 (Tex. App.—Houston [1st Dist.] 2009, pet. den.). "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to delay or defraud any creditor of the debtor." TUFTA § 24.005(a)(1). In determining whether a debtor acted with actual intent to hinder, delay, or defraud a creditor of the debtor, the court considers a nonexhaustive list of factors commonly referred to as the badges of fraud. *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 436–37 (5th Cir. 2013) (citing *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008)). These badges include, but are not limited to, whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a

>substantial debt was incurred; and
>
>(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TUFTA § 24.005(b)(1)–(11).

"'Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.'" *Coleman Cattle Co., Inc. v. Carpentier*, 10 S.W.3d 430, 433 (Tex. App. —Beaumont 2000, no pet.) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986)). "Thus, whether a debtor has conveyed property with the intent to defraud creditors is 'ordinarily a question for the jury or the court passing on the fact.'" *Id.* at 433–34 (quoting *Quinn v. Dupree*, 303 S.W.2d 769, 774 (Tex. 1957)). Summary judgment is proper when the "evidence conclusively establishes that the transfer was made without an intent to defraud." *Id.* (citing *Connell v. Connell*, 889 S.W.2d 534, 542 (Tex. App. —San Antonio 1994, pet. den.)). If "'fraudulent intent is only to be deduced from facts and circumstances which the law considers as mere badges of fraud and not fraud per se, these must be submitted to the trier of fact, which draws the inference as to the fairness or fraudulent character of the transaction.'" *Id.* (quoting *Quinn*, 303 S.W.2d at 744).

## IV. Analysis

Williams's summary-judgment briefing did not clearly address which badges of fraud provided circumstantial proof of GVG's actual intent to hinder, delay, or defraud its creditors. After comprehensive review of the briefing, the court decided that the badges of fraud that Williams raised included whether: "the transfers were made to insiders; each transfer occurred shortly before or shortly after a substantial debt was incurred; and GVG received no value in exchange for the transfer," and whether the transfers occurred when GVG was insolvent. After analyzing the

summary-judgment evidence, the court concluded that Williams had failed to show that the transfer was to an insider under TUFTA § 24.005(b)(1) and that GVG made the transfers when it was insolvent under TUFTA § 24.005(b)(9). Regarding solvency, the court concluded that the summary-judgment evidence did not support a solvency determination in favor of either party. The court then concluded that Williams proved that the transfer was made shortly after a substantial debt was incurred under TUFTA § 24.005(b)(10) and that the transfers were not made for reasonably equivalent value under TUFTA § 24.005(b)(8).

In its motion for reconsideration, Compass Bank focuses on the four badges of fraud that the court analyzed. In response, Williams again does not clearly specify which badges of fraud he believes are present as circumstantial evidence that the transfers to Compass Bank were fraudulent. Instead, Williams discusses "other badges" of fraud that are not included under TUFTA § 24.005(b) and argues that material factual disputes over GVG's intent when it transferred MetLife loan proceeds to Compass Bank are raised by "suspicious" facts in the summary-judgment record. *See* Docket Entry No. 202 at 3 ¶ 6 ("Fifth, broadly speaking, any suspicious circumstance is a badge of fraud."); ¶ 7 (discussing "facts 'tending to throw suspicion upon the transaction[s]'").[1] But Williams fails to cite summary-judgment evidence with the specificity Rule 56 requires and fails to tie that evidence to the legal standards under TUFTA. Williams addresses the transfers to Compass Bank globally and generally, failing to analyze the evidence on the reasons Compass Bank identifies for those transfers.

In reply, Compass Bank admits that, construing the record "in favor of the Trustee, the

---

[1] Williams does challenge the court's ruling under TUFTA § 24.005(b)(1). The court will not reconsider its ruling on this badge of fraud. Williams presented no evidence that the transfer effectively kept the money in an "insider's" control, as contemplated under TUFTA. *See* §24.002(7)(B); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191 (Tex. App. —Houston [1st Dist.] 2014, pet. den.).

summary judgment evidence shows that, at most, one or two badges of fraud are present." (Docket Entry No. 208 at 11). Compass Bank argues that two badges of fraud are insufficient as a matter of law to find actual intent to delay, hinder, or defraud. Compass Bank relies on *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313 (Tex. App. —El Paso 2009, no pet.), *Van Slyke v. Teel Holdings, LLC*, No. 01-08-600-CV, 2010 WL 2788876 (Tex. App. —Houston [1st Dist.] July 15, 2010), and *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251 (Bankr. W.D. Tex. 2009). These cases do not make the two-badges-are-not-enough proposition as clear as Compass Bank argues.

In *Clayton*, the underlying facts are unclear. The Claytons sued Texas Custom Pools ("TCP") and obtained a jury verdict in their favor. The court entered judgment against TCP for $1,269,829. *Clayton*, 293 S.W.3d at 303. TCP deposited $125 with the district clerk and filed a Certificate of Cash in Lieu of Supersedeas Bond supported by an affidavit from TCP's CFO stating that TCP had a negative net worth of $165,182.00. *Id.* at 303–04. The Claytons filed a motion contesting TCP's net worth. After a two-day hearing, the court concluded that TCP had a net worth of $8,681,659.87. In making that determination, the court concluded that TCP had made improper deductions from its net worth to reach the negative $165,182.00 value. The court concluded that, among other things, a $1.3 million loan should be added to TCP's net worth. "The court did not specify the basis for its ruling, but the loan proceeds could be added back into net worth only if the court found that the payment of the loan proceeds to the shareholders was a fraudulent conveyance" under TUFTA. *Id.* at 311. On appeal, the court analyzed every potentially relevant section of TUFTA that would support avoiding the loan transfer. In its analysis of actual intent to delay or defraud creditors under TUFTA § 24.005(a)(1), the appellate court found that the evidence showed

only three badges of fraud that did not support avoiding the $1.3 million transferred loan payments. The case does not stand for a bright-line rule that if the evidence supports only three or fewer badges of fraud, then no fraudulent conveyance occurred as matter of law.

*Van Slyke* is similar. In that case, Teel Holdings, LLC sued Kenneth and Patricia Van Slyke under TUFTA. The jury found for the plaintiff. The Van Slykes appealed, challenging the legal and factual sufficiency of the jury's finding of a fraudulent transfer. The appeals court concluded that the trial court erred "in its charge to the jury [by] combining the theories of actual and constructive fraud into a single question." *Van Slyke*, 2010 WL 2788876, at *1. The appeals court found two badges of fraud and, as "in *Clayton*, the badges, even when considered together, [were] not a 'particularly strong' indicator of the Van Slyke's actual intent to hinder, delay or defraud Teel. *Clayton* stands for the proposition that a 'mere choice to pay one creditor over another, even when the second creditor has already sued the debtor, does not by itself, establish fraudulent intent.'" *Id.* at *6. "Patricia . . . was a perfected, secured creditor with . . . a valid lien that had priority over Teel's judgment. . . . She was entitled to payment out of her collateral. . . . Hence, Nationwide's $205,000 payment to Patricia in satisfaction of [her l]oan and payments made against [her other loan] did not, by themselves, demonstrate fraudulent intent but were permissible to satisfy Patricia's security interests." *Id.* The case is heavily tied to its facts and does not stand for a bright-line three-badges-of-fraud minimum rule.

In *In re SMTC Mfg. of Tex.*, 421 B.R. at 309–10, the court concluded that "at most only two badges of fraud can be found. In contrast, the Defendants [had] provided overwhelming and uncontroverted evidence that these cost reallocations were done for legitimate business purposes, and that the Debtor received reasonably equivalent value for the expenses allocated to its books."

*Id.* The court reached this conclusion after considering direct and circumstantial evidence of actual intent. The case does not stand for the proposition that, as a matter of law, two badges of fraud cannot support a TUFTA claim.

Compass Bank acknowledges that, viewing the evidence in the light most favorable to Williams, two badges of fraud arguably exist. Compass Bank also recognizes that deciding intent based on circumstantial badges-of-fraud evidence requires credibility determinations and fact weighing. Because the fuller record provided by a bench trial will enable this court to make more accurate and correct findings and conclusions as to fraudulent intent, the court declines to grant Compass Bank's cross-motion for summary judgment that the transfers were not fraudulent as a matter of law. This ruling is without prejudice to Compass Bank seeking judgment as a matter of law at the bench trial that it is not liable to Williams.

The court notes that the summary-judgment evidence favors Compass Bank. The financing memorandum produced during MetLife's underwriting process recognized that the money was being used to refinance certain debts and that the health of the company depended, in large part, on the housing market. The unpredictability of the hurricane and the recession that dried up the housing market years later appear to have caused GVG's bankruptcy. The evidence that transfers made years before the unpredictable events that sent the company into bankruptcy were made with the intent to defraud creditors is weak. Additionally, Compass Bank offers explanations for each of the challenged transfers. The Masseys transferred $3 million in proceeds from its loan to GVG, which subsequently used $2 million to pay down the Massey Note. The $1,266,525 payment on the GVG Note is also explained as GVG's repayment of money it had borrowed years before filing for bankruptcy. Finally, GVG was a guarantor on the OTWM Note, which provided the financing for

the Willis property. Paying off debt incurred as a legitimate business expense is generally not a fraudulent transfer.

Williams fails to analyze the facts that both GVG and OTWM guaranteed the MetLife loan, that GVG had its own debts, and that GVG used the MetLife loan proceeds to pay off its debts. Williams suggests that GVG simultaneously guaranteeing the OTWM note and paying rent to OTWM was suspect. This argument overlooks the fact that the GVG "rent payments" were used to pay down the principal balance on the OTWM note. That the Masseys used a holding company to finance the purchase of property for their GVG business and paid off the loan using GVG proceeds years before GVG's bankruptcy is not as inherently suspect as Williams suggests. This case is close to the facts involved in both *Clayton* and *Van Sykes,* in which the courts found no fraudulent transfers.

In sum, the court grants Compass Bank's motion for reconsideration of the denial of its summary-judgment motion but declines, on this record, to grant the motion. This ruling is without prejudice to Compass Bank's moving for a ruling that, based on a fuller record as to GVG's solvency when it made the disputed transfers and whether they were made for reasonably equivalent value, the transfers were not fraudulent as a matter of law.

## IV.     Conclusion

The court grants Compass Bank's motion to reconsider the denial of its summary-judgment motion, but on the present record, declines to grant the motion. The final pretrial conference will be held on July 25, 2014, at 9:00 a.m. and the bench trial will be held on July 30, 2014, at 9:00 a.m.

SIGNED on July 22, 2014.

Lee H. Rosenthal
United States District Judge